**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

UNITED STATES OF AMERICA          :          CRIMINAL ACTION

            v.                                            :

STEPHEN LASHLEY                    :          NO. 09-307

**MEMORANDUM ON DEFENDANT'S MOTIONS (1) TO DISMISS OR FOR OTHER RELIEF FOR PROSECUTORIAL MISCONDUCT AND (2) FOR SUPPRESSION OF EVIDENCE AND (3) FOR BIFURCATION**

Baylson, J.                                                    November 2, 2011

## I.      Introduction

Before the Court are three motion submitted by Defendant Stephen Lashley: Defendant's

Motion to Dismiss the Indictment (ECF No. 77) on the grounds of prosecutorial misconduct;

Defendant's Motion to Suppress the testimony of Officer Troy Jones (ECF No. 76); and

Defendant's Motion to Bifurcate the Trial (ECF No. 81).  For the reasons discussed below,

Defendant's Motion to Dismiss the Indictment will be DENIED, Defendant's Motion to

Suppress will be DENIED, and Defendant's Motion to Bifurcate the Trial will be GRANTED.

However, the Court will strike certain paragraphs from the Second Superceding Indictment for

the reasons stated below.

## II.      Procedural Background

On May 5, 2009, Defendant was charged in this District in a two-count indictment.  (ECF

No. 1.)  Trial began on December 7, 2009, and the following day the jury returned with a guilty

verdict on both counts.[1]  The Court sentenced Defendant on March 11, 2010 (ECF No. 47), and

_____

[1]The trial transcripts are available at ECF Nos. 54-55.

1

appointed new counsel, Carolyn Goldner Cinquanto, Esquire, for purposes of appeal (ECF No. 50).

On appeal, Ms. Cinquanto, after her detailed review of the record, discovered that the government's trial prosecutor had failed to provide Defendant's trial counsel with a copy of the plea agreement signed by the government's chief witness at trial and had made misstatements of fact to the jury.  In a brief filed by Ms. Cinquanto with the Third Circuit, Defendant argued that his conviction should be reversed due to misconduct by the trial prosecutor before and during trial.  See Def. Ex. A to Motion to Dismiss, Lashley Appellate Br.  The government conceded that a new trial was appropriate. See Def. Ex. B to Motion to Dismiss; Government Appellate Br. at 1.  The Third Circuit accordingly remanded the case to this Court for a new trial. (ECF No. 59.)  In preparation for his new trial, Defendant filed the Motions that are the subject of this Memorandum.  (ECF Nos. 76, 77, 81.)  The Court held an evidentiary hearing on the motions on September 21, 2011.  (ECF No. 88.)

## III.    Discussion

### A.    Motion to Dismiss the Indictment

#### 1.    Factual Background

The parties do not dispute the following facts.  Prior to Defendant's trial, Jason Mack, who would later become the government's chief witness against Defendant, pleaded guilty in the District of South Carolina to two counts related to the illegal purchase and transfer of firearms.  His plea agreement required him to cooperate and testify on behalf of the government.  The agreement further contemplated that the government would file a Federal Rule of Criminal Procedure 35(b) motion to reduce Mr. Mack's sentence if Mr. Mack were sentenced before his

cooperation was complete.  Mr. Mack testified at Defendant's trial but the trial prosecutor,

Assistant United States Attorney Arlene Fisk, had never produced Mr. Mack's plea agreement to

Defendant as part of discovery.  The government and Defendant do not dispute that this failure to

produce the plea agreement violated Defendant's rights as set forth in Brady v. Maryland, 373

U.S. 83 (1963).

In addition, during the Government's closing argument, Ms. Fisk represented to the jury

that Mr. Mack had nothing to gain from his testimony at Defendant's trial.  Specifically, she

stated:

> You have heard Jason Mack was charged with the illegal purchases by
> lying on forms of these guns, and he didn't get a slap on the wrist for it.
> And it's not like he's looking to benefit by virtue of his continued
> testimony to you.  He's been sentenced to these offenses.  He was
> sentenced to three years in Jesup . . . for the illegal purchase of those guns.
> He could at this point come in and say, look, you know, I did it, I got
> caught, and the heck with all of you, I'm not talking about this anymore,
> but he did not do that.  He came in and said I did it, I got caught, but there
> were other people involved in the distribution of these guns.

12-8-09 Tr. at 89, ECF No. 55.

Additionally, nine days after trial, Ms. Fisk e-mailed the South Carolina prosecutor

stating:

> I know that [ATF agent] Dave Ford gave you the good news about
> Stephen Lashley's conviction, but I wanted to be sure you knew that Jason
> Mack fully complied with the terms of his cooperation guilty plea
> agreement by providing full and complete testimony at Lashley's trial.  Let
> me know whether you need anything else in order to pursue a Rule 35
> sentence reduction on behalf of Mack.

Govt. 9-15-11 Br. at 12, ECF No. 83.

Defendant also argues that other statements the prosecutor made during closing argument

3

were improper.  Def. Letter Br. at 2 (citing Def. Ex. A to Motion to Dismiss, Lashley Appellate Br., at 40).  These include "misstatements about the possible prosecution of another government witness, Faheem Berry, repeated references to the danger of guns in Philadelphia, invitations to speculate about incriminating evidence, improper vouching, and a bizarre suggestion that the police were not in the courtroom to hurt the jurors."  Id. at 2-3 (internal citations omitted).

At the evidentiary hearing on this and other pending motions, Ms. Fisk testified that her failure to turn over the plea agreement was unintentional.  Audio File, Courtroom_3A_9-21-2011, ECF No. 88.  Ms. Fisk conceded that she had failed to keep accurate records of all of the material she turned over to the defense.  She described how she received Mr. Mack's plea agreement from the South Carolina prosecutor via e-mail roughly six months before the original trial, printed it, and put it in her grand jury file.  Later she received a hard copy of documents from the South Carolina prosecutor, which his assistant indicated constituted Mr. Mack's case file.  Ms. Fisk instructed her paralegal to copy, Bates stamp, and produce the file.  Mr. Mack's plea agreement had not been in the case file; however, Ms. Fisk did not realize her failure to provide a copy of the plea agreement to Defendant until after the trial, when Ms. Cinquanto requested proof that it had been turned over.

Ms. Fisk testified that the government's original Trial Memorandum had indicated that Mr. Mack had entered into a guilty plea agreement, Trial Mem. at 2, ECF No. 28, but despite this, Defendant's trial counsel had never asked the government to produce the missing plea agreement.

At trial, neither side questioned Mr. Mack about his plea agreement.  Ms. Fisk testified that in telling the jury during closing argument that Mr. Mack was not looking to benefit from his

4

testimony, she had been influenced by a conversation she had had with Mr. Mack while preparing for trial, in which Mr. Mack told her he had other reasons to testify and was not looking to get a benefit from his testimony.  Ms. Fisk acknowledged that her statement to the jury was nevertheless inaccurate.  She testified that her practice is to give her closing argument without notes, and that she forgot her statement to the jury immediately after she said it.  She also testified that when she wrote the e-mail to the South Carolina prosecutor, she was not focused on the statement she made about Mr. Mack in closing argument.

After the trial, the government submitted a Sentencing Memorandum in which it stated in a footnote that Mr. Mack had pleaded guilty and that the government had filed a motion to reduce Mr. Mack's sentence pursuant to Federal Rule of Criminal Procedure 35(b).  Govt. Sentencing Memorandum at 2, ECF No. 42.  Still, Ms. Fisk testified, it did not occur to her that she had made an incorrect statement during closing argument, until Ms. Cinquanto quoted the argument in her Third Circuit brief.  Ms. Fisk testified that she was embarrassed and disappointed with herself upon realizing her mistakes.  She went immediately to her direct supervisor as well as Robert Zauzmer, Esquire, who supervises appeals in the U.S. Attorney's Office for the Eastern District of Pennsylvania to discuss her errors and to determine the appropriate course of action.  The result was the government's joining in the Defendant's request for a new trial.

### 2. <u>Legal Standard</u>

The Third Circuit has held that "[w]hile retrial is normally the most severe sanction available for a <u>Brady</u> violation, where a defendant can show both willful misconduct by the government, and prejudice, dismissal may be proper." <u>Government of the Virgin Islands v. Fahie</u>, 419 F.3d 249 (3d Cir. 2005).  Because a new trial has already been ordered in this case, the Court

must apply the two-prong test of willfulness plus prejudice to determine whether the facts at hand justify the rare remedy of dismissing the indictment.

>3.   **Analysis**

>>a.   **Willfulness**

At the hearing, after hearing testimony, the Court entered a factual finding that Ms. Fisk was credible and that the Brady violation had been inadvertent.  The Court reserved judgment on whether the violation could be considered "willful" under Fahie.  Defendant argues that, even if inadvertent, the Court should still consider the Brady violation "willful" because Ms. Fisk's conduct before and during trial represents a "pattern of recklessness."

In Fahie, the Third Circuit held that "reckless misconduct, if prejudicial, may sometimes warrant dismissal."  419 F.3d at 256.  "Otherwise," the Court explained, "a prosecutor who sustains an erroneous view of her Brady obligations over time will be inadequately moved to conform her understanding to the law." Id.  The trial prosecutor in Fahie had failed to turn over a trace report of the gun Jaheem Fahie was charged with possessing without a license.  Id. at 251. The trace report contained the name of the gun's registered owner, and stated that the gun had not been reported stolen.  Id.  The prosecutor did not provide a copy of the report to the defendant. Id.  When, at trial before the Territorial Court of the Virgin Islands, defense counsel discovered the existence of the report upon cross-examination of the detective who ran the trace, defense counsel objected and argued that the report was exculpatory, material evidence withheld in violation of Brady.[2]  Id.  The prosecutor responded that the report was exempt from discovery

_____

[2]The defendant in Fahie also argued that the failure to turn over the documents violated Federal Rule of Criminal Procedure 16(a)(1), which is not at issue in this case.

under Federal Rule of Criminal Procedure 16(a)(2).  Id.  The trial court held that the report was Brady material and that its non-disclosure prejudiced the defendant's due process rights; accordingly, it dismissed the case with prejudice.  Id.  The Appellate Division of the District Court of the Virgin Islands agreed that the non-disclosure of the report violated Brady, but reversed the dismissal.  Id. at 251-52.

On appeal, the Third Circuit affirmed the Appellate division, noting that the prosecutor did not intentionally withhold the Brady material. Id. at 255.  Rather, she was "more misguided than calculating in her handling" of the relevant report, apparently "over-looked the significance" of the report, and "may have simply lost track of the report between the time it was produced, in late July, and the start of trial in October."  Id.  at 255-56.  The Third Circuit then reviewed the record to determine whether the prosecutor was reckless.  Id.  The defendant attempted to show a pattern of recklessness on the part of the prosecutor by pointing to: (1) a government witness's statement during a suppression hearing that no fingerprint analysis had been conducted on the gun; (2) the government's later memo indicating that a fingerprint test had been done but was inconclusive; and (3) the government's failure to properly handle the gun, which precluded the defendant from conducting an independent fingerprint analysis. Id. at 256.  The Third Circuit concluded that "the prosecutor was at times disorganized, but not reckless," and held that dismissal with prejudice was therefore improper.  Id. at 256-57.

The Court is aware of only one case in which a federal appellate court affirmed the dismissal of an indictment for a Brady violation.  United States v. Chapman, 524 F.3d 1073 (9th Cir. 2008).  Although this case is not binding upon the Court, it is nevertheless instructive as to when dismissal is appropriate in light of prosecutorial misconduct including a Brady violation.

7

In Chapman, the district court declared a mistrial and then dismissed the indictment after the trial prosecutor failed to provide the defense material required by Brady and Giglio v. United States, 405 U.S. 150 (1972). Id. at 1077-80.  There, in addition to failing to keep a log of the hundreds of thousands of pages of discovery the government produced in discovery, the trial prosecutor "repeatedly represented to the court that he had fully complied with Brady and Giglio, when he knew full well that he could not verify these claims."  Id. at 1085.

In Chapman, the government had notice that there were problems with its discovery production, but did nothing about it until the trial court ordered it to produce verification of the required disclosures.  Id.  Instead, the government first tried to "paper over" its mistake.  Id.  It was not until the trial court pursued the matter during the trial that the government finally produced over 650 pages that consisted of rap sheets, plea agreements, and cooperation agreements related to numerous government witnesses.  Id. at 1079.  The trial court declined to find the failure to disclose the materials intentional, explaining that realistically it is difficult to prove such a mindset unless the prosecutor admits he or she deliberately withheld the information, id. at 1085, but still found the prosecutor acted "flagrantly, willfully, and in bad faith."  Id. at 1080 & n.2.  The Ninth Circuit concluded that the trial court did not abuse its discretion in dismissing the indictment under its supervisory powers[3] because the record supported its findings that "the government recklessly violated its discovery obligations and made flagrant misrepresentations to the court."  Id. at 1086.

The Court finds that although Ms. Fisk committed serious mistakes in this case, her

---

[3]The Ninth Circuit did not reach the question of whether the prosecutor's violation of the defendant's due process rights also justified dismissal. Chapman, 524 F.3d at 1073 n.5.

conduct does not rise to the level of a "pattern of reckless behavior" as described in Fahie, nor to the degree of fault of the prosecutor in Chapman.

As was the prosecutor in Fahie, Ms. Fisk was "disorganized, but not reckless" in failing to turn over the plea agreement. See 419 F.3d at 256. Furthermore, there is indication that Ms. Fisk believed she had in fact turned the agreement over. She asked her paralegal to copy and produce the documents the North Carolina prosecutor had labeled as Mack's case file and assumed—incorrectly though not unreasonably—that the plea agreement was in the file. The government referenced the plea agreement in its original Trial Memorandum and later in its Sentencing Memorandum. Indeed, Ms. Fisk testified that she did not realize she never turned over the plea agreement until it became an issue on appeal.

More troubling, however, is Ms. Fisk's incorrect and false representation to the jury that Mr. Mack was not looking to gain from his testimony.[4] At the time of this misrepresentation, Ms. Fisk had knowledge that Mr. Mack was entitled to a sentencing reduction by virtue of his plea agreement. Although the Court credits her testimony that she was not thinking about this

---

[4]The government argues that this statement is "more appropriately discussed in the double jeopardy context, which focuses on whether the prosecutor misspoke in an intentional effort to goad the defendant into seeking a new trial." Govt. Letter Br. at 4 n.2, ECF No. 92. The Court agrees with the government that Ms. Fisk did not "intentionally goad" the Defendant into requesting a new trial and as such the double jeopardy clause does not bar retrial in this case. See Oregon v. Kennedy, 456 U.S. 667, 675-76 (1982) ("Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion."); see also United States v. Wallach, 979 F.2d 912, 916 (2d Cir. 1992) (noting that Kennedy rationale should be extended to situations where, instead of provoking a mistrial, a prosecutor engages in an act of deliberate misconduct to prevent an acquittal). The Court nevertheless finds that the misstatement to the jury about Mack's plea agreement is appropriately considered in analyzing whether dismissal is warranted under Fahie, as it grew out of—and compounded the negative effect of—the underlying Brady violation.

information during her closing argument, she should have, and her focus on other facts does not excuse her omission in the consequential misrepresentation.  Indeed, the fact that nine days later she sent an e-mail to the South Carolina prosecutor that Mr. Mack could benefit from his cooperation, makes it hard to accept all of her excuses for what happened or did not happen, during the trial.

Nevertheless, the Court stands by its finding that her error—though a serious one—was inadvertent.  Furthermore, even if this statement were reckless, it alone does not represent the pattern of violations that <u>Fahie</u> requires to justify dismissal.  Defendant argues that in combination with the original <u>Brady</u> violation and other allegedly inflammatory or incorrect statements Ms. Fisk made during closing argument, the closing argument about Mr. Mack becomes part of a "pattern" of reckless misconduct.  This Court disagrees.  The Court has already concluded that the underlying <u>Brady</u> violation resulted from disorganization, not recklessness.  The Court also finds that the other potentially improper statements Ms. Fisk made during closing argument may have been inappropriate, but were not reckless.  As such, Defendant here, as in <u>Fahie</u>, "has failed to demonstrate a pattern of violations by which he can demonstrate reckless, and therefore willful, misconduct."  <u>See</u> 419 F.3d at 256.

Nor does Ms. Fisk's conduct approach the level of prosecutorial misconduct present in <u>Chapman</u>.  Unlike in <u>Chapman</u>, Ms. Fisk never made intentional misrepresentations directly to the court.  <u>See</u> 524 F.3d at 1085.  On the contrary, once she realized her mistake she immediately consulted with her supervisors and together they decided to inform the Third Circuit of the error and to agree to a new trial.  Additionally, the prosecutor in <u>Chapman</u> failed to turn over hundreds of pages of potentially exculpatory discovery, <u>id.</u> at 1079, whereas Ms. Fisk failed to produce

10

only one document, albeit a crucial one.

Furthermore, in finding that a pattern of reckless misconduct may sometimes warrant dismissal, the Third Circuit in Fahie was guided by a policy concern that "[o]therwise, a prosecutor who sustains an erroneous view of her Brady obligations over time will be inadequately motivated to conform her understanding to the law."  419 F.3d at 256.  There is no showing that Ms. Fisk is unaware of her obligations under Brady.  This is not a case where dismissal is necessary to deter a prosecutor who has repeatedly violated the rights of criminal defendants and will continue to do so if not taught a lesson by virtue of having a case dismissed.[5] The Court accordingly finds that Ms. Fisk did not exhibit a pattern of reckless behavior and therefore did not act willfully.

Finally, in contrast to Chapman, where the Ninth Circuit held that dismissal was appropriate under the district court's supervisory powers but declined to reach the question of whether the government's misconduct constituted a due process violation that would also warrant dismissal, 524 F.3d at 1073 n.5, the Third Circuit held in Fahie that a trial court should not dismiss the indictment under its supervisory powers unless the government's conduct satisfies the same test for dismissal based on a Brady violation.  419 F.3d at 258.  The Third Circuit concludes its discussion in Fahie with the following statement of Third Circuit law on

---

[5]The government's brief discloses that as an Assistant District Attorney in 1988, Ms. Fisk tried two cases in which defendants asserted Brady violations and obtained relief.  Govt. Br. at 14-15, ECF No. 83 (citing Wilson v. Beard, 589 F.3d 651 (3d Cir. 2009) and Commonwealth v. Ly, 980 A.2d 61, 85 (Pa. 2009)).  Although denying relief under Brady to one defendant, Ly notes that a second defendant was entitled to relief, citing Lee v. City of Philadelphia, No. 06-761 (E.D. Pa.).  Because of the age of the violations, and the fact that in neither case was Ms. Fisk found to have acted recklessly or willfully, the Court does not consider these past violations sufficient to require dismissal of the indictment in the instant case.

prosecutorial misconduct and a court's supervisory powers:

> Given the "societal interest in prosecuting criminal defendants to conclusion," it is especially important in the criminal context that a court applying sanctions for violation of Rule 16 carefully assess whether dismissal with prejudice is necessary to exact compliance with discovery obligations. <u>Coleman</u>, 862 F.2d 455. In particular, as discussed above, a court must look to both the need to undo prejudice resulting from a violation and the appropriate deterrent value of the sanction in each case.

419 F.3d at 258.

> While we appreciate the importance of all these factors, we believe that, to merit the ultimate sanction of dismissal, a discovery violation in the criminal context must meet the two requirements of prejudice and willful misconduct, the same standard applicable to dismissal for a <u>Brady</u> violation. Accordingly, we do not expect that trial courts will dismiss cases under their supervisory powers that they could not dismiss under <u>Brady</u> itself.

<u>Id.</u>

Therefore, having found that the prosecutor did not commit the <u>Brady</u> violations or misrepresentation during closing argument willfully, this Court cannot dismiss the indictment. See <u>Fahie</u>, 419 F.3d at 256.

### b.   <u>Prejudice</u>

The Third Circuit explained in <u>Fahie</u> that "[o]nly if a defendant has demonstrated that his rights were violated and that the violation was willful need a court again consider the degree of prejudice in fashioning an appropriate remedy." <u>Id.</u> at 256 n.10. The Court will nevertheless consider the potential prejudice to Defendant in this case in order to determine whether further equitable remedies are necessary, exercising the Court's supervisory powers. See <u>Fahie</u>, 419 F.3d at 258 ("The purposes underlying the use of courts' supervisory powers are broad and include implementing remedies for violations of recognized rights and remedies to deter illegal

conduct.").

Defendant argues persuasively that he has suffered prejudice as a result of the government's misconduct and resultant new trial.  Def. Letter Br. at 3.  At the new trial, Mr. Mack must arguably testify consistently with his previous testimony against Defendant or risk impeachment or even a perjury charge.  Defendant is prejudiced because Mr. Mack has already received a sentencing reduction in exchange for testifying against Defendant, and thus, it will now be more difficult for the jury to understand cross examination and arguments by defense counsel about Mr. Mack's self interest motives for testifying.  In addition, the judge who sentenced Mr. Mack does not have the ability to change the sentence if Mr. Mack refuses to cooperate or the government, for whatever reason, seeks to increase his sentence.

As Defendant points out, see Def. Letter Br. at 4, the government should not be able to get a "better deal" as a result of its Brady violation.  See Chapman, 524 F.3d at 1087 (approving the district court's finding that on retrial, the government's case would improve because its witnesses would not repeat their previous mistakes, "and that's an advantage the government should not be permitted to enjoy").  The Court has considered whether it should sanction the government by not allowing the government to call Mr. Mack as a witness at the retrial, but concludes that this would be a "back door" method of dismissing an indictment, because without Mr. Mack, the government basically has no evidence against the Defendant.

However, the parties are on notice that the Court intends to instruct the jury as necessary to prevent the government from gaining any advantage at the retrial.  At the least, the Court will instruct the jury that Mr. Mack has already received a benefit from testifying against Defendant and that it should therefore consider his testimony with great caution.  The Court invites the

parties to submit a proposed instruction on this point, and for any other instructions, either during the testimony or before deliberations, that might lessen the prejudice to Defendant.

Defendant would also be subject to significant prejudice should the government be permitted to introduce new evidence against him.  Cf. id.  For example, the government submitted a Motion in Limine to admit evidence regarding additional gun purchases Defendant allegedly made. (ECF No. 78.)  The government acknowledges that some of the evidence at issue in the Motion—specifically, guns allegedly purchased for Defendant by Elmer Lorenzo Jordan—was not introduced at Defendant's first trial.  Audio File, Courtroom_3A_9-21-2011, ECF No. 88.  As the Court stated at the September 21, 2011 evidentiary hearing, it would be unfair for the government to be able to bolster its case by submitting new evidence against him. At the hearing, the government agreed and consequently offered to withdraw its motion.  The Court therefore dismissed the motion as moot (ECF No. 89).

Both Counts of the Superseding Indictment, however, charge offenses involving a Smith and Wesson, Model SW9VE firearm that was not referenced by the Indictment pursuant to which Defendant was originally tried.  (Compare ECF No. 82, with ECF No. 1.)[6]  Rather, on both Counts, the original Indictment mentioned two other guns, which remain in the Superseding Indictment. Id.  At the evidentiary hearing, the government argued that notwithstanding its previous offer to withdraw the Motion to admit new evidence, the Court should allow the Superseding Indictment on the newly-charged gun to stand because the government could always

---

[6]Count II of the Superseding Indictment also references multiple previous convictions of Defendant, whereas the previous Indictment referenced only one. Compare ECF No. 82, with ECF No. 1.  The jury is only entitled to know that Defendant has one prior conviction, to which the parties indicated they would stipulate. Id.

bring new and separate charges related to that firearm.  Audio File, Courtroom_3A_9-21-2011, ECF No. 88.  Whether or not that is true, the government's case against Defendant on the originally-charged guns would be bolstered by evidence of any wrongdoing by Defendant in relation to the third gun.  The Court again finds that the government should not be able to improve its case against Defendant through its own misconduct.  The Court will strike these allegations in the Superseding Indictment accordingly.

### B.   Motion to Suppress

On August 29, 2011, Defendant filed a Motion to Suppress Officer Troy Jones' Testimony regarding certain inculpatory evidence discovered at Defendant's house during his arrest on November 25, 2007.[7]  The government filed a response, and on September 21, 2011, as already mentioned above, the Court held a hearing regarding this Motion and others.  After the hearing, both parties were permitted to submit supplemental briefing regarding the issue of suppression.

### 1.   Officer Jones' Testimony

At the suppression hearing, the Government called as a witness Warrant Officer Troy Jones ("Officer Jones").  See Audio File, Courtroom_3A_9-21-2011, ECF No. 88.  Officer Jones testified to the following facts, which testimony the Court found credible.

On November 25, 2007, Officer Jones and two other officers visited 2658 South Daggett Street, a row house in southwest Philadelphia, for the purpose of arresting Defendant pursuant to a municipal court warrant.  Upon arrival at the row house, Officer Jones and a second officer knocked on the front door while the third officer went to cover the rear door of the house.  After

---

[7]Defendant's original trial counsel failed to file any substantive pretrial motions.

5-10 minutes, Defendant's mother and girlfriend answered the front door.  At first, they denied

knowing the Defendant.  Officer Jones and his partner were permitted to enter the premises, and

after another 5-10 minutes of conversation in the living room, Defendant's mother and girlfriend

eventually admitted to knowing Defendant but stated that he was not in the house and that they

did not know his whereabouts.

 During his conversation with the mother and girlfriend, Officer Jones suddenly saw

Defendant appear in the kitchen, which was immediately adjacent to the living room.  When

Officer Jones first noticed Defendant, Defendant was standing two to three feet from a basement

door located in the kitchen.  The basement door was open; however, Officer Jones did not

actually see whether Defendant had entered the kitchen through the door.  As soon as Defendant

appeared, the officers apprehended him and brought him into the living room, where he was

placed under arrest.  The third officer who had been covering the rear of the property was called

to enter the house and help the other officers, which he did.

 Upon putting Defendant in handcuffs, one officer stayed with Defendant while Officer

Jones and the other officer secured the kitchen area by visually inspecting the room to make sure

that no other individuals were hiding there.  Immediately thereafter, Officer Jones and his partner

proceeded to the open basement door.  Officer Jones testified that had been "surprised" and

"scared" by the Defendant's appearance "out of the blue" near the basement door and "alarmed"

by the fact that the mother and girlfriend had lied about Defendant's presence inside the house.

Moreover, Officer Jones could hear a dog barking and other noises and movement coming from

the basement; he "didn't know" whether all of the sounds were coming from the dog or if some

of the noises were being caused by one or more people in the basement.  As a result, the officers

16

went down the basement steps, guns drawn, specifically with the purposes of determining if there might be "another individual somewhere else in the basement" who could "pose a threat" to them.

When the officers reached the bottom of the stairs, they could see that the basement was not an open floor plan but rather was divided into a corridor and separate rooms. Looking down the length of the basement corridor, they did not see any people, though they could see a pit bull chained behind a barricade at the end of the corridor. Next, the officers proceeded into a basement bedroom through a doorway located about two feet to their left. In the bedroom lying in plain view, Officer Jones saw two gun cases, at least three types of ammunition, and a number of small glass vials with black tops. The gun cases were empty.

The officers secured that bedroom by checking to make sure no individuals were hiding there and then similarly secured a bathroom and TV-area. Finally, they secured the barricaded area in which the dog was located by looking over the barricade to confirm that there were no individuals hiding behind it.

After the officers had finished securing the basement and returned to the main floor of the house, one of the officers went back down into the basement to get clothing for Defendant. Officer Jones testified that Defendant was wearing only boxer shorts and a T-shirt when he appeared in the kitchen, and the officers wanted to provide him with additional clothing before they brought him outside into the cold.

### 2.   <u>Legal Analysis</u>

The government and the defense agree that the lawfulness of the basement search is governed by <u>Maryland v. Buie</u>, 494 U.S. 325 (1990), but they dispute the proper application of

Buie to the circumstances presented here.  In Buie, police officers in Maryland obtained an arrest

warrant for Buie and his accomplice based on their alleged involvement in an armed robbery.  Id.

at 328.  The officers executed the warrant at Buie's house, where they apprehended him as he

emerged from the basement.  Thereafter, one detective entered the basement "in case there was

someone else" down there.  Id. at 328.  While in the basement, the detective discovered

inculpatory evidence lying in plain view. Id.  Upon review of the lawfulness of the search by the

Supreme Court, the Court held that the following legal standard should apply:

> [A]s an incident to the arrest [ ] officers could, as a precautionary matter
> and without probable cause or reasonable suspicion, look in closets and
> other spaces immediately adjoining the place of arrest from which an
> attack could be immediately launched.  Beyond that, however, we hold
> that there must be articulable facts which, taken together with the rational
> inferences from those facts, would warrant a reasonably prudent officer in
> believing that the area to be swept harbors an individual posing a danger to
> those on the arrest scene.

Id. at 334.  The Court then remanded the case to the Court of Appeals of Maryland to determine

in the first instance whether the facts were sufficient to justify the search under the standard set

forth in Buie.  On remand, the Court of Appeals held that the evidence in the basement had been

seized lawfully, see Buie v. State, 580 A.2d 167 (Md. 1990); the U.S. Supreme Court denied

Buie's subsequent petition for certiorari, see Buie v. Maryland, 498 U.S. 1106 (1991).

Here, the question is whether Officer Jones articulated specific facts that, along with any

related rational inferences, would have warranted a reasonably prudent officer to conduct a

protective sweep of Defendant's basement in order to ensure the safety of the officers at the

scene.  The government, however, attempts to shortcut this analysis by asserting that the

basement was "immediately adjoining" the place of arrest and therefore subject to search without

18

reasonable suspicion.  The Court is not persuaded by this argument—without reasonable suspicion, Buie would permit, at most, an inspection of the basement stairwell, not a search of the entire basement.

The Court turns now to an assessment of the relevant facts in light of the legal standard in Buie.  First, Defendant was standing two to three steps away from the basement door when the officers first noticed him, and the basement door was open.  Although Officer Jones did not actually see Defendant emerge from the basement, it was reasonable for him to infer that Defendant had entered the kitchen through the basement.  See United States v. Sabur, 2005 WL 2340701, at *5 (E.D. Pa. Sept. 22, 2005) (holding that a protective sweep was lawful where "the proximity to the entrance to the basement" of a gun lying in plain view on the kitchen floor "gave rise to a warranted belief that others may have been located in the basement").

Second, Officer Jones testified that Defendant's appearance in the house revealed to the officers that the mother and girlfriend who answered the door had lied to them about who was inside.  One reasonable inference to be drawn from these facts is that the officers could not reliably inform themselves about whether another person might be in the basement simply through questioning the family.  See United States v. Parrott, 2009 WL 4043292, at *5 (E.D. Pa. Nov. 20, 2009) (holding that officers' knowledge of false statements by an occupant of a house about who else was inside of the house was a factor supporting the reasonableness of a protective sweep).

Furthermore, the fact that the floor plan of the house made it possible for Defendant to "surprise" the officers "out of the blue" suggests that it was reasonable for them to believe that they could not properly protect themselves from attack unless they secured the kitchen and

19

basement area.  See Buie, 494 U.S. at 333 ("An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings.").  Indeed, the floor plan of the basement itself—specifically the fact that it was dry-walled into separate rooms rather than one open space—justified the officers' entrance into each basement room rather than a more cursory visual inspection from the vantage point of the bottom of the stairwell.

Finally, Officer Jones testified that he heard noises and movement coming from the basement.  One of the noises was the sound of a dog barking, but he did not know whether all or merely some of the noises were from the dog.  Understandably, and under circumstances in which Defendant had just emerged from what Officer Jones reasonably concluded to be the basement, Officer Jones feared that another dangerous person might be hiding there.  Defendant's contention that "it [wa]s clear" that the sounds from below were only those of a dog—a contention the testimony does not support and common sense suggests would be difficult to determine from the main floor of the house—would not necessarily render the search unreasonable, even if true.  See Def. Letter Br. at 6.  Depending upon the relevant circumstances, it might be reasonable for officers to worry that a loud animal moving around in a basement would prevent them from detecting the approach of a person intending to attack them.

In sum, Officer Jones' protective sweep of the basement was lawful under the standard articulated in Buie, and the admission of the evidence he discovered in plain view during that search is not precluded by the Fourth Amendment.  In light of this holding, the Court declines to address the question of whether the evidence is also admissible on the grounds of inevitable discovery insofar as an officer ultimately returned to the bedroom to obtain clothing for Defendant.  See Govt. Letter Br. at 11.

### C.    **Motion to Bifurcate Trial**

On September 11, 2011, Defendant filed a motion to bifurcate his trial on Count Two, which charges Defendant with being a felon in possession of a fire arm.  18 U.S.C. § 922(g)(1). Specifically, Defendant requests that the trial be bifurcated such that the jurors do not hear about his prior conviction until they have deliberated on the Count One charge of illegal transportation of fire arms, 18 U.S.C. § 922(a)(3), as well as on the elements of the offense of Count Two that do not include the existence of a prior conviction—that is, whether Defendant knowingly possessed a firearm and whether it was in or affecting interstate commerce.  Once the jury has deliberated on Count One and assuming it has found in favor of the government on the first two elements of Count Two, the jury would then hear evidence about Defendant's qualifying conviction.

Defendant argues that his proposed bifurcation is appropriate because Defendant is willing to stipulate that he was not licensed to deal, import, manufacture, or collect firearms, which the Government must prove as an element of Count One.  Accordingly, the existence of the prior conviction is relevant only to Count Two and is not necessary to prove that the Defendant was unlicensed for purposes of Count One.

In response, the government first acknowledges that a trial court may, in its discretion, sever a latter charge involving a prior conviction in order to mitigate prejudice to the defendant during the jury's consideration of the other charges.  See United States v. Joshua, 976 F.2d 844, 847 (3d Cir. 1992), abrogated on other grounds by Stinson v. United States, 508 U.S. 36 (1993). However, the government argues that bifurcation is unwarranted in this case because the prior conviction is admissible as "proof of motive" under Federal Rule of Evidence 404(b).

21

Specifically, the government argues that Defendant obtained guns through straw purchases in South Carolina because his prior conviction would have prevented him from obtaining a license to buy guns legally.

The Court is not persuaded by the government's contentions.  The existence of Defendant's prior conviction is not very probative of Defendant's possible motive for committing the illegal transportation offense.  As the government stated in its response to the Motion, it must prove the following two elements to secure a guilty verdict on this count: "(1) [that] the defendant was not licensed to deal, import, manufacture, or collect firearms; and (2) [that] the defendant willfully transported into (or received in) the state in which the defendant resided a firearm that the defendant purchased or otherwise obtained outside that state."  Govt. Response at 3.

Defendant already has submitted that he will stipulate to the first element of the crime. Regarding the second element, his prior conviction is just as probative of why he might illegally obtain a gun in-state—which would not violate § 922(a)(3)—as it is why he might transport or receive a gun obtained from out-of-state.  Under the circumstances, the Court concludes that the probative value of admitting the prior conviction with respect to Count One is substantially outweighed by the degree to which it would prejudice Defendant in front of the jury.  See Federal Rule of Evidence 403.  Thus, unless the defense somehow "opens the door" to the admission of the prior conviction, see, e.g., United States v. Busic, 587 F.2d 577, 585 (3d Cir. 1978) (holding that the admission of a prior conviction was not reversible error where the conviction was introduced to rebut a defense of entrapment), rev'd on other grounds, Busic v. United States, 446 U.S. 398 (1980), the Government is precluded from offering it until necessary to prove the

relevant element of Count Two.

In light of this determination and in light of the Third Circuit's recommendation that a court "strongly consider" bifurcation where a felon in possession charge is joined with other charges, see Third Circuit Model Criminal Jury Instructions, § 6.18.922G-1, Defendant's Motion to Bifurcate is granted.

**IV.**      **Conclusion**

For the foregoing reasons, Defendant's Motion to Dismiss the Indictment is DENIED, Defendant's Motion to Suppress is DENIED, and Defendant's Motion to Bifurcate the Trial is GRANTED. Additionally,  the Court will strike the aforementioned paragraphs of the Superseding Indictment.

An appropriate Order follows.

O:\Criminal Cases\09-307 Lashley, US v\Lashley MEMO 11-2-11.wpd